IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 7, 2016

## STATE OF TENNESSEE v. ROBIN BASS

**Appeal from the Criminal Court for Shelby County**
**No. 13-04325      W. Mark Ward, Judge**

_____

**No. W2015-02484-CCA-R3-CD  -  Filed January 27, 2017**

_____

The Defendant, Robin Bass, was convicted of first degree murder in the perpetration of or attempt to perpetrate a robbery. See Tenn. Code Ann. § 39-13-202(a)(2). In this appeal as of right, the Defendant contends that the evidence was insufficient to sustain his conviction, arguing that there was no proof that he intended to rob the victim or that the murder occurred during the perpetration of or attempt to perpetrate a robbery. Additionally, the Defendant argues that the extrajudicial confessions used to convict him were uncorroborated. Following our review, the judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Claiborne H. Ferguson (on appeal), Memphis, Tennessee; and Stephen C. Bush, District Public Defender; Jim Hale and Patrick Newport, Assistant Public Defenders (at trial), for the appellant, Robin Bass.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Stark and Ray Lepone, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

-1-

This case arose following the December 24, 2011 shooting death of the victim, Gus Crittle. Thereafter, the Shelby County Grand Jury charged the Defendant with one count of murder in the first degree in the perpetration of or the attempt to perpetrate robbery. See Tenn. Code Ann. § 39-13-202. A trial was held in the Criminal Court for Shelby County on October 26 and 27, 2015.

At the Defendant's trial, the State offered the following evidence. Jerry Howard, a neighbor of the victim, testified that in December 2011, he was living at Country Squire Apartments and that the victim lived in the apartment directly above his. Mr. Howard was asked about what he remembered from the night of December 24, 2011, the night the victim was killed. Mr. Howard stated that he returned home from work around 7:20 p.m., and at 7:30 p.m., he began loading chairs into his car. He testified that at this time, nothing appeared to be out of the ordinary in the parking lot near his vehicle, and he went back inside his apartment. Mr. Howard explained that at 8:15 p.m., he took another load of items out to his vehicle, and he noticed what he thought was "some trash" lying on the ground between his "girlfriend's car and the neighbor's car." Mr. Howard walked closer and "saw that it was a dead body, blood [was] glistening off the hub caps and hood of the vehicle, and [he] saw blood coming from the [the victim's] shirt and jacket onto the pavement." Mr. Howard then explained that he saw a "blood trail" leading from the victim's body up to the victim's apartment. He called 911 and said that approximately thirty to forty-five minutes later the police arrived at the apartment complex. The police "locked down the whole section, nobody could leave or enter."

Mr. Howard testified that between the first time he went to his vehicle at 7:30 p.m. and the second time he returned around 8:15 p.m., he heard a loud noise from the victim's apartment above him. He explained that he "heard a loud bang noise like a body was being body slammed onto the floor because it shook the chandelier above [his] dining room table . . . ." Mr. Howard stated that he had heard loud sounds from the victim's apartment before because the victim's children would occasionally "[run] up and down the hallways making noise." Mr. Howard said the noise that evening was similar to the noise made when the children were running in the victim's apartment. He stated he was going to go upstairs to say something to the victim about the noise, but his girlfriend convinced him to "just let it slide."

Mr. Howard also testified that after the police arrived on the scene, he stayed and discussed what he had observed with the police. At trial, he identified four photographs of the apartment complex and the location of the victim's body in the parking lot. While viewing the photographs, Mr. Howard indicated that the location of the victim's apartment was directly above his own apartment. He also identified the victim's body lying next to a parked red Mustang. When asked if he heard any gunshots other than the "loud boom," he responded, "I'm not a gunshot expert but I knew what I heard and it

-2-

shook the chandelier, it shook the dining room chandelier.  It sounded like a body hitting the floor."

On cross-examination, Mr. Howard explained that he never heard anyone arguing.  Aside from the loud "thud," he testified that he did not hear anything else.  He said that he was able to estimate the time he found the victim's body in the parking lot at approximately 8:15 p.m. "because after [he] saw the body [he] called 911 emergency number . . . [a]nd that was at 8:18 p.m."

Deundre Dortch testified that he was the victim's best friend.  Prior to the murder, the two worked together in apartment maintenance and performed inspections.  He explained that they would "go in and out [of] people's apartments" and "fix whatever they needed fixed."  Mr. Dortch explained that he and the victim were "together every day.  [They were] like brothers."  He stated that he had been to the victim's home at Country Squire Apartments several times and stated that the victim lived there with his girlfriend and his children.  He also testified that on December 24, 2011, the victim's girlfriend and children had traveled out of town, and the victim was alone in their apartment.

When asked what he remembered about the evening of December 24, 2011, Mr. Dortch said that on that morning, he had made plans to meet "up with" the victim later in the day.  He indicated that he received a call from the victim around 6:00 p.m. that evening, but he missed the call.  He attempted to return the call several times, but the victim never answered or called back.  He again explained, "I never got an answer, but [that] is normal because . . . I talk to him every day."  Mr. Dortch also stated that the victim was on call to respond to emergency apartment maintenance issues, and he "figured he was at the apartment complex . . . working[.]"

Mr. Dortch testified that around 7:00 p.m. that evening, he received a call to "fix a hot water tank" at an apartment complex where he worked.  He explained that this apartment complex was located very close to the apartment complex in which the victim lived.  After Mr. Dortch fixed the hot water tank, he drove by the victim's apartment complex on his way home.  He glanced in the parking lot but did not see the car the victim usually drove, so he continued driving without stopping.  He then said that a few minutes after passing the victim's apartment complex, he received a call from another apartment maintenance worker, who asked if he had spoken to the victim that evening.  That worker then told Mr. Dortch, "[T]he police [are] over there by his house, you might need to come back and see what's going on."  Mr. Dortch attempted to call the victim "probably ten times," but he still never got an answer.  When he returned to the victim's apartment, "one of the officers put [him] in the back of the police car and they asked [him] a few questions."  He stated the police asked him if he could "identify some

tattoos" that might help them determine the identity of the victim. Mr. Dortch then identified the man on the ground as the victim.

Mr. Dortch admitted that the victim sold marijuana out of his apartment. On cross-examination, Mr. Dortch further discussed the victim's marijuana "selling habits." When asked if the victim would have let a stranger come into his home, Mr. Dortch responded, "not that [he] knew of."

Willie Bond stated he knew the victim because the victim was a "maintenance man" at Trinity Lakes, the apartment complex in which he lived. Mr. Bond explained that he had exchanged several phone calls with the victim on the night of December 24, 2011, because the victim was supposed to come to Mr. Bond's apartment at Trinity Lakes to "drink something" with him. Mr. Bond testified that the victim originally planned to arrive at his apartment at 6:00 p.m.; however, "it was almost 8:00 o'clock when [he] talked to him again and that's when he said [he was] on his way[.]" Mr. Bond said he waited for forty-five minutes and then left his apartment. He stated he never saw the victim again.

Richard Kirkpatrick testified that he knew the victim because he was the apartment manager at Trinity Lakes where the victim "worked with [him] as one of [his] maintenance men." He said that on December 24, 2011, he spoke with the victim. The victim called him to "make sure that he could do overtime. [There was] an upstairs unit . . . that had . . . a toilet that was stopped up, . . . so he called to make sure that he could do that." Mr. Kirkpatrick confirmed that he approved the victim's overtime work that day and testified that he never saw or talked to the victim again.

Dr. Karen Chancellor explained that she was the Chief Medical Examiner for Shelby County, and she testified as an expert in forensic pathology. After conducting an autopsy on the victim, Dr. Chancellor found that he had suffered a gunshot wound to the front of his chest and another gunshot wound to his right hand. She determined that the cause of death was "the gunshot wound injury of the chest that harmed the heart and the right lung causing massive bleeding inside the body." She testified that the toxicology analysis of the victim's blood revealed that there were "cannabinoids present in the blood[,]" which she explained were "products that are in marijuana[.]"

On cross-examination, Dr. Chancellor testified that she collected the personal effects that were on the body of the victim at the time of his death. Along with his clothes, shoes, and hat, Dr. Chancellor documented finding $1,456 in the victim's pocket.

Willie De Jeanette Taylor explained that the victim was her son and that he was murdered on Christmas Eve 2011. When asked if she knew the Defendant prior to her son's murder, she said no. She then explained that she dealt with the grief of losing her

son by communication "through letters[,] witnessing and ministering to [the Defendant] for three years[.]" She said that she also visited the Defendant once at the jail. She confirmed that visit occurred on December 27, 2012, near the time of the one-year anniversary of her son's death. She was then asked if the Defendant confessed to murdering her son during the visit, and she replied:

> I'm not going to say he confessed to me but when I went in to see him he was crying bitterly and he looked at me and he told me, he said for all that I am which may not mean a lot to you I want you to know that I did not murder your son.

After making this statement, she testified that the Defendant explained to her there was an "altercation between them." She then said that "them" was referring to

> [the Defendant] and [the victim]. [The Defendant] and [the victim got] in an altercation . . . , and that [there] was a gun involved, they got into a tussle and he said that the gun had went off and shot [the victim] in the hand and [the victim] ran out of the apartment, and [the Defendant] heard him running down the steps and he stayed in because he knew [the victim] had a gun as well, and he waited til [sic] he didn't hear anything else and he left. And he said when he saw [the victim], [the victim] was alive and that he didn't kill him.

She was asked if the Defendant told her why he had gotten "into an altercation" with her son, and she replied, "It was supposed to be a robbery gone bad." She elaborated, "[The Defendant] was supposed to be robbing my son."

Ms. Taylor testified that she had not seen any autopsy reports relating to her son's death. She said that when she attempted to gain access to the reports, she was denied because her son's death was a homicide. She testified that prior to speaking with the Defendant, she was unaware of the specific injures her son sustained. She explained that "[t]he death certificate only [said] that [the victim] died of multiple gunshot wounds."

On cross-examination, she was asked when she mentioned the conversation she had with the Defendant to the State. Ms. Taylor confirmed that she had been in contact with the State several times leading up to the trial, but the first time she mentioned her conversation with the Defendant at the jail was the day before the trial began. She also acknowledged that the only time she and the Defendant discussed her son's death was the day she visited him. The two had exchanged letters, but in the three letters the Defendant sent to Ms. Taylor, he had never discussed the incident regarding the botched robbery. She also agreed that on the day she visited the Defendant, no one else was with her.

Officer John Stone testified that he was employed with the Memphis Police Department and was assigned to the Crime Scene Division. When asked to describe his duties, he said that his duties consisted of "anything from collecting evidence, recording evidence and preserving evidence, . . . collecting evidence on the scene and transporting it down . . . to the Property and Evidence Room, from taking photographs to dusting prints." He also explained that he took pictures at a crime scene and that if there was any evidence collected, he tagged it. He testified that he was involved with this case and that he found the victim lying in the parking lot with a .9 mm caliber handgun "tucked underneath his leg." He explained that the handgun could not have been fired in the condition in which he found it because "the safety was engaged and there was no actual bullet round inside the chamber of the gun[.]" He noted that there were "little red drops of possible blood" starting near the victim's body, leading up the stairs towards the victim's apartment, and then into the victim's apartment. He also saw similar red drops inside the victim's apartment, and he observed a strong smell of marijuana upon entering. Inside the doorway of the apartment, Officer Stone found a .9 mm caliber shell casing and observed a bullet strike on the wall. He said there was a .40 caliber shell casing lying on the floor of the kitchen. Also, he found a small digital scale, which he explained was used to measure "small weight items . . . anything from pills to powders[.]" On the dining room table, he saw "a Whole Foods bag and a Wal-Mart bag and another clear plastic bag with a green leafy substance[.]" He testified that the bags contained nearly one pound of marijuana. He stated that there were small red drops throughout the apartment and that one of the windows was shattered. There was a gun magazine lying on the steps leading away from the victim's apartment. Additionally, he found a bullet located on the ground in the parking lot.

Canieya Jones testified that on December 24, 2011, she was staying at an apartment in the Trinity Lakes apartment complex. She explained that a bathtub was broken and required maintenance. On that same day, the victim came to the apartment to repair the bathtub, but he never actually fixed the bathtub. She stated that she knew he sold "weed", and instead of repairing the bathtub, they smoked together that evening. She testified that while they were smoking weed, he received several phone calls. After the calls, he left to "to make a serve at Country Squire" apartments. She stated that "make a serve" meant that he was going to "sell weed or whatever he sold." When asked if she noticed anything about these phone calls, she replied, "Well, he was ignoring them and he was like I don't know what's going on, dude acting like the police he's trying to set me up, I'm going ahead and do this, I'll be right back." She said that he received several calls, and based on her observations, she believed the same person was calling repeatedly. After answering these calls, she said the victim "was acting as if he didn't want to do it but he felt like he had to, like stubborn and like fidgety[.]" She said he did, however, leave her apartment when it was "almost dark," and after that, she never saw him again.

Jason Legrone testified that he had known the Defendant for "eleven or twelve" years and that they were very close friends. He said the Defendant came "over to [his] house almost every day." Mr. Legrone testified that on December 24, 2011, he was living with his mother in Raleigh.[1] He further explained that he saw the Defendant that day and said, "[H]e came over there, [they] kicked it for a little while . . . before doing some tattoos, then [they] went to [the Defendant's] mamma's house and put the kid's bikes together for Christmas and then went back to [Mr. Legrone's] mamma's house." He said he could not remember the exact time the Defendant arrived at his house, but he stated, "I know [when] he came over there it was nighttime."

Mr. Legrone was asked if he remembered "learning at some point that [the Defendant] was being investigated for the death of [the victim]." He said that he was not aware the Defendant was being investigated until the Defendant arrived at Mr. Legrone's mother's house where Mr. Legrone was staying in Raleigh on December 24, 2011. The State then asked him if he received a phone call in January of 2012 from the police regarding what time that the Defendant arrived at Mr. Legrone's mother's house on Christmas Eve, and Mr. Legrone testified,

> I know I had . . . it was some kind of way they got in touch with me, that's how they started making me come down here they got in touch with me the first time and they asked me some questions.
>
> I really can't remember because . . . it's been three years.

Mr. Legrone further explained that he had "a problem with drugs" and that he "really couldn't remember a whole lot. [He got] high a lot." He claimed he had "been getting high since [he] was fifteen."

Also, he testified that he did not remember talking to the police during the investigation in the early months of 2012. He said that he did not remember giving a statement to police in April of 2012 regarding the victim's murder. He denied that the Defendant ever told him about the robbery and murder, and when asked if it was true the Defendant told him that he waited in the car while "Cameron and Rail went upstairs" to rob and shoot the victim, he said no. He confirmed that he had gone to the police station to talk to them about the Defendant; however, he said that he did not remember anything they discussed. He said he signed the statement just so he could leave the station. He

---

[1] Mr. Legrone is referring to Raleigh, Tennessee, which is a suburban community in Memphis, Tennessee. RALEIGH NEIGHBORHOOD IN MEMPHIS, TENNESSEE, http://www.city-data.com (last visited Nov. 14, 2016).

claimed that he was high on drugs at the time and would "say anything." He also said that he was high while testifying during the trial.

Sgt. Israel Taylor said that in April of 2012, he was assigned to work with the Memphis Homicide Bureau, and while working there, he met Mr. Legrone. Sgt. Taylor testified that prior to this, he had nothing to do with the investigation or arrest of the Defendant and that the Defendant was already in custody and charged when he met Mr. Legrone. He explained that when Mr. Legrone came to talk to him, Mr. Legrone was "extremely nervous[,]" but "he was of sound mind, he didn't seem high, he didn't seem drunk, he was just nervous."

Sgt. Taylor said that Mr. Legrone made a statement, which he reduced to writing. The State asked him how Mr. Legrone arrived at the police station, and he explained that an individual named Marlon Dawson brought him to the office. Sgt. Taylor explained that after he took the statement, he gave Mr. Legrone the opportunity to review it. He testified that Mr. Legrone initialed the corners of each page and signed the statement. He confirmed that Mr. Legrone appeared to actually read and review the statement and that he was present when Mr. Legrone signed the statement. After Sgt. Taylor identified a document as Mr. Legrone's written statement, it was marked and received into evidence. On cross-examination, Sgt. Taylor confirmed that Mr. Dawson had a pending federal drug case, and he wrote a letter to the federal prosecutor informing him that Mr. Dawson aided in the murder investigation by bringing Mr. Legrone to the police station.

The State asked Sgt. Taylor about the contents of the statement. First, counsel read the following colloquy from Mr. Legrone's statement,

Q: Do you have knowledge who was present or who was responsible for the homicide of [the victim]?

A: I don't know the name of the person who was killed but I know who was there.

Q: Who was present that you know of?

A: Cameron, whoever Rail is, and [the Defendant].

Q: How do you know this information?

A: [The Defendant] told me.

Q: What did [the Defendant] tell you?

A: [The Defendant] told me Cameron put him on a bogus mission. He told me that Cameron used his cell phone to call the dope man. [The Defendant], [said] that him, Cameron and Rail, went over to where the man lives. [The Defendant] said that Rail shot the man, he said Cameron told him that.

Q: Did [the Defendant] tell you why he, Rail and Cameron went over to the dope man's residence?

A: He told me that they were going to take the weed. They was going to pull off with the weed.

Q: Did [the Defendant] say if he was inside when the shooting happened?

A: He said he was in the car.

Q: When and where did this conversation take place?

A: We was at a house in Raleigh, it was the day before he turned himself in.

Special Agent Cervinia Braswell testified that she was a "Special Agent assigned as a Forensic Scientist in the Firearm's Identification Unit for the Tennessee Bureau of Investigation" and testified as an expert in firearms identification. She stated that she examined the shell casings found during the investigation, and she determined that the .9 mm and the .40 caliber shell casings found in the victim's apartment were fired from two different guns. She also testified that the weapon found under the victim's leg would not have fired in the condition in which it was found. The bullet found inside the victim was a .9 mm, and she explained that bullet was not fired from the .9 mm pistol found under the victim's leg.

Ryan Harger stated that he was employed with Sprint in the legal compliance department. He explained that his job duties were "[supervising] a group of analysts who receive and respond to subpoenas and legal demands from law enforcement and attorneys for customer records." He confirmed that such customer records included phone numbers and specific names associated with those phone numbers. Mr. Harger testified that on December 24, 2011, the Sprint call log indicated that there were two calls from the telephone the Defendant was using, one at 8:53 p.m. and a second call at 9:20 p.m., and that the purpose of these calls was to change the telephone number.

Michael Harber stated that he worked for the Shelby County Sheriff's Office, Homeland Security Division. Specifically, he testified that he worked in the Phone

Monitoring Unit, which included listening to jail phone calls. He said that each jail phone call made was linked to a specific person through an identification number and each call was recorded. He then identified a disc he created that included recorded phone calls for the Defendant. The jail phone call recorded the Defendant's saying that he did not believe Mr. Legrone would be a problem and that Mr. Legrone was leaving town. Also, the Defendant would not talk about what Mr. Legrone said to the police over the phone.

Sgt. Robert Wilkie stated that he was employed with the Memphis Police Department and assigned to the Homicide Bureau. He explained that on the evening of December 24, 2011, he was called to the scene where the victim's body was found. He stated that in the parking lot, he found the following evidence: a bullet near where the victim was lying on the sidewalk and a pistol that was located underneath the victim's leg. Additionally, he explained that there were two sets of stairs; one set leading up to the victim's apartment and another set leading away from the victim's apartment. There was a blood trail leading from the victim, up the stairs, and into the victim's apartment. Sgt. Wilkie also said there was a magazine from another weapon on a set of steps leading away from the victim's apartment. Additionally, he explained that the gun found under the victim's leg "was on safe and there was not a round in the chamber, so it was useless." He also explained that he did not locate any witnesses on the scene. He did speak with Mr. Howard, the neighbor who said he found the victim lying on the sidewalk. However, he said that he was unable to find anyone who heard or saw what happened to the victim.

Sgt. Wilkie also testified that he was able to identify the victim. He explained that the victim's friend, Mr. Dortch, "described the tattoos and what the person had on his body, then by that [they] were able to . . . identify [the victim]." Sgt. Wilkie also said that he obtained a search warrant for the victim's apartment and, upon entering it, found "a spent shell casing on the floor [,]" "blood on the wall[,]" and "a bullet strike on the wall." Furthermore, "on the dining room table was a bag that contained a bunch of marijuana."

Sgt. Wilkie explained the steps he takes when beginning a homicide investigation. He said that after they determined the identity of the victim, it was important to ascertain what the victim was doing at the time of his death. He stated that he began gathering more information by looking through the victim's cell phone. Additionally, he talked with friends of the victim, who informed him that the victim was a maintenance man and that he had been working on December 24, 2011, at an apartment complex approximately a mile from his own apartment. Sgt. Wilkie believed that the homicide was a result of "some type of transaction that went wrong" based on the discovery of marijuana in the victim's apartment and the fact that his friends indicated he had been dealing drugs.

Sgt. Wilkie testified that there were several suspicious phone numbers on the victim's cell phone. He said that several phone numbers had called the victim's phone repeatedly in the time leading up to his death and that one phone number in particular stood out from the others. He was particularly interested in this phone number after Ms. Jones told him that the victim "said that he was fixing to go make a drug transaction and it was someone he didn't trust." He attempted to call the number but was unable to reach anyone because the number had been changed. As a result, he said that he obtained a subpoena for the victim's phone records and discovered that there were four incoming calls from that particular number on December 24, 2011. He further stated, "[The calls] were all late in the evening around the time . . . we believe [the victim] was shot and killed." Sgt. Jones said he believed the victim was found around 8:00 p.m., and an incoming call from this number was recorded at 7:50 p.m. Additionally, there was a missed call from this same number on the victim's phone at 7:57 p.m. He testified that he eventually learned the cell phone number belonged to Wendy Bass and that after further investigation, concluded that the Defendant was the person using the cell phone.

Sgt. Wilkie then explained that he attempted to convince the Defendant to come in and speak with him about the case. Sgt. Wilkie testified that he originally called the Defendant and tried to get him to come in on January 9, 2012, but the Defendant never arrived. He then informed the Defendant's family that he was looking for him and sent a squad car to his address. On January 11, 2012, the Defendant's parents brought him to the police station, and the Defendant turned himself in to Sgt. Wilkie. At that point, Sgt. Wilkie informed the Defendant of his Miranda rights, and after the Defendant indicated he understood those warnings, the Defendant agreed to speak with him. Initially, he stated that the Defendant told him "that he had been at his aunt's house in Raleigh and had never left Raleigh" on December 24, 2011. Sgt. Wilkie said he confronted the Defendant with contradictory evidence he had gathered during his investigation and told the Defendant that the phone records indicated that he was nowhere near the Raleigh area on that date. Then, the Defendant changed his story slightly, and Sgt. Wilkie said the Defendant told him "[t]hat he had been with Derrick Blackwell . . . all day." Sgt. Wilkie testified that he informed the Defendant that the phone records also failed to indicate that the Defendant was in the Cordova area. Additionally, he testified that he had spoken to Mr. Blackwell, who said that the Defendant was not with him. Sgt. Wilkie said the Defendant then admitted that he was not with Mr. Blackwell that day and told him "[t]hat he was with Jason Legrone all day[.]" Sgt. Wilkie said that he attempted to confirm if the Defendant had been with Mr. Legrone all day, but he discovered from Mr. Legrone that Mr. Legrone did not see the Defendant on December 24, 2011, until almost 10:00 p.m.

Sgt. Wilkie asked the Defendant how he drove around on December 24, 2011. First, the Defendant said that he had borrowed Mr. Blackwell's car, and when Sgt. Wilkie told the Defendant that Mr. Blackwell denied this, the Defendant indicated that he

borrowed a car from Mr. Legrone. Sgt. Wilkie told the Defendant that Mr. Legrone said that he had never let the Defendant use his car, and the Defendant replied that he actually borrowed a rental car from a man named Jamal Mobley. Sgt. Wilkie said that he was unable to confirm if this was true because "[the Defendant] said [Mr. Mobley] was from out of town and didn't know any information about him."

Sgt. Wilkie stated that he also questioned the Defendant about changing his phone number on the night of December 24, 2011. The phone records indicated that the phone number was changed at approximately 10:00 p.m. that evening. He said that at first, the Defendant explained that he changed his phone number because "he was just sick of people and . . . folks bothering him." Also, he testified that the Defendant told him that he knew the victim from buying marijuana from him in the past but denied seeing the victim on December 24, 2011. However, during the conversation, the Defendant admitted to speaking to the victim and seeing him on Christmas Eve. The Defendant first explained that the reason he called the victim was because he was trying to buy some marijuana from him but that the victim's price was too high, so he found someone else from whom he planned to purchase the drugs. Sgt. Wilkie testified that the Defendant said because he bought drugs from someone else, he was "dodging the victim[.]" However, Sgt. Wilkie testified that he told the Defendant there were no incoming calls from the victim, and in response, the Defendant said that he did meet the victim at an apartment complex. Sgt. Wilkie stated that the Defendant told him the transaction occurred at "an apartment complex behind the Wal-Mart up Trinity towards Shelby Farms." Sgt. Wilkie said he was able to confirm that there was an apartment complex located behind that Wal-Mart; however, the apartment complex was a gated community, and when he visited the complex, he "couldn't get them to buzz [him] in as the police." He said the Defendant told him he was able to enter the complex because he "simply waited on a car and followed it in."

Sgt. Wilkie continued to testify about the Defendant's statement. He said that the Defendant informed him that he did not pay the victim the full price when he purchased the drugs: "the price was $475 but he only gave the victim $400, and so . . . he shorted him $75 and left him." The Defendant told Sgt. Wilkie that this was the true reason he changed his phone number that night.

Sgt. Wilkie also testified that he spoke with the Defendant again the next day on January 12, 2012, and the Defendant gave another statement. The Defendant was in custody at this time, and Sgt. Wilkie advised the Defendant of his Miranda rights. Sgt. Wilkie read this statement during trial, which stated that the Defendant knew the victim from purchasing marijuana from him and that the last time he saw the victim was on December 24, 2011. He met with the victim to purchase marijuana from him at a gated apartment complex. He gained access to the apartments by following a car through the

gate.  The Defendant drove to the apartments in a car he rented from one of "[Mr. Legrone's] friend[,] Jamal [Mobley's] mother."  The Defendant was supposed to pay the victim $475 for the drugs; however, he only paid the victim $400 because he did not have the full amount.  After paying the victim, the Defendant drove to Mr. Legrone's house, picked him up, and the two went to a hotel where "a couple of [his] partners and [his] sister and little cousin [were] getting tattoos."  The Defendant remained at the hotel for a few hours and then returned to his own house around 3:00 a.m. or 4:00 a.m.  He changed his phone number that evening after purchasing marijuana from the victim because he "shorted [the victim] on the weed and [he] was trying to get away from some women."  He also admitted that he did not initially tell investigators about the deal.  Originally, the Defendant told investigators that he was in Raleigh at "his auntie's house" and that he was with "Derrick Blackwell."  The Defendant explained that he decided to tell investigators the truth about what he did on December 24, 2011, "because [the investigators] started telling [him that they] didn't care about the weed, that [they] were only here for the homicide and [they] told [him his] phone records put [him] over there in the area [where the victim was killed]."

At the conclusion of the trial, the jury convicted the Defendant as charged, and the Defendant was sentenced to life imprisonment.  The Defendant filed a timely notice of appeal.  The case is now before us for our review.

ANALYSIS

The Defendant contends the evidence was insufficient to sustain his conviction of murder in the first degree in perpetration of or attempt to perpetrate a robbery.  See Tenn. Code Ann. § 39-13-202(a)(2).  Specifically, the Defendant argues there is no proof indicating that the Defendant was invovled in the murder of the victim or that he attempted to commit robbery.  Also, he aruges that his confessions contained within the witnesses' statements were uncorroborated.  Thus, the Defendant argues the evidence does not support his conviction.  The State responds that the evidence is sufficient and that there is proof that corroborated the Defendant's confessions.

On appeal, the Defendant challenges only the sufficiency of the convicting evidence.  An appellate court's standard of review when the Defendant questions the sufficieny of the evidence on appeal is "whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state.  See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions regarding witness

-13-

credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id., State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

"Direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, first degree felony murder is defined as, "A killing of another committed in the perpetration of or attempt to perpetrate . . . robbery . . . ." See id. Additionally, "[n]o culpable mental state is requried for conviction under subdivision (a)(2) or (a)(3), except the intent to commit the enumerated offenses or acts in those subdivisions." "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

Under Tennessee law, "a person cannot be convicted solely on the basis of an uncorroborated extrajudicial confession." State v. Bishop, 431 S.W.3d 22, 61 (Tenn. 2014); see also State v. Clark, 452 S.W.3d 268, 279 (Tenn. 2014). Appellate courts are to apply the following "modified trustworthiness test":

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

Bishop, 431 S.W.3d at 58-59. Our supreme court further explained that "[o]ne way the State can effectively bolster the defendant's admission or confession is to present

-14-

independent evidence that 'parallel[s] the defendant's confession' or corroborates the defendant's account of what happened immediately before and after the crime." Id. at 60.

Here, there is sufficient proof to support the Defendant's conviction. Mr. Howard testifed that he heard a loud bang from the victim's apartment shortly before he discovered the victim's body in the parking lot. Officers found almost one pound of marijuana in the victim's apartment, and there was over $1,000 in cash in the victim's pocket. The cell phone the Defendant was using that night called the victim several times around the time of his death, and the Defendant admitted to seeing the victim that night and carrying out a drug deal in which he shorted the victim $75. The Defendant also admitted to changing his phone number that evening, shortly after the time of the victim's death. Furthermore, the Defendant gave several inconsistent statements to the police about his location and activities on the night of December 24, 2011.

Additionally, there was substantial independent evidence that shows the Defendant's confessions to Ms. Taylor and Mr. Legrone are trustworthy. Ms. Taylor testified that the Defendant told her that her son was shot in the hand during an altercation involving a gun. He characterized the episode as a "robbery gone bad." The Defendant's confession to her was reliable because it corroborated evidence that her son had been shot in the hand, a fact that investigators never mentioned to her during the investigation. Ms. Taylor had not seen the autopsy report, and she was not aware of the specific injuries before speaking with the Defendant. Mr. Legrone's statement to the police indicated that the Defendant admitted that he participated in a plan with Cameron and Rail to rob the victim and that he was present when the victim was killed. The Defendant told Mr. Legrone that Cameron used the Defendant's cell phone to "set up a bogus deal" with the victim, and they went over "to where the dope man lives" with a plan "to take the weed." Ms. Jones testifed that on the night of his murder, the victim received several phone calls about "making a serve" that appeared to make the victim nervous, and the victim felt like he was "being set up." Several witnesses testified that they knew the victim to be a drug dealer, and there was approximately one pound of marijuana and a small digital scale found in the victim's apartment. Furthermore, Mr. Legrone's statements regarding the botched robbery match Ms. Taylor's statement that the Defendant told her that he attempted to rob her son. Thus, there is sufficient independent evidence to corroborate the Defendant's confessions to Mr. Legrone and Ms. Taylor. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for murder in the first degree in the perpetration of or attempt to perpetrate a robbery.

## CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE